And we'll move to the fourth case of the day, United States v. John Buncich, appeal number 20-2569. I see we have Mr. Holler and Ms. Conner here, both sides. And Ms. Conner, we'll proceed when you're ready. Good morning, and may it please the Court. I'm Curie Conner, and I'm here today on behalf of Mr. Buncich. This is our second visit to the Appellate Court. We originally in Mr. Buncich's first appeal, we were able to overturn three of six counts, and there was error found on the remainders, but it was determined to be harmless. As a result, there was a remand to the District Court for sentencing. And I've raised several issues, but with the limited amount of time we have, obviously I'll take any questions the Court has. I'd like to focus on the first issue, which is the penalty in terms of the lost valuation on the benefit of any...the benefit slash amount of any bribes that were paid, and the second issue of the Court's presumptive use of the guidelines in determining the ultimate sentence that Mr. Buncich would receive. In this case, when the government chose to assert the benefit analysis under 2C1.1b2, to determine the lost amount, the burden rests with the government to prove by the preponderance of the evidence, not merely that there was some perceived benefit to the towers who had paid bribes, but the actual monetary benefit received by those towers. And in this case, what the government argued to the Court was that, as to Mr. Zarmack, that every tow he had done since the beginning of the Buncich administration would, in fact, be used as a benefit conferred. As to Mr. Jurgensen, the Court went back to 2013, and then to the end of the 2016, when both were removed by the City Council. The important point here is that the corrupt payments in this case did not begin for Mr. Jurgensen, who was a government informant, until April of 2014, and for Mr. Zarmack, October of 2014. For Mr. Zarmack, Ms. Conner, the government is arguing that the $500 he gave in 2009, prior to the defendant's election, and then another check that he had given, that those were bribe payments, and therefore, once your client got into office, any tows from there on should count, because those bribe payments were made really to maintain his place on the list. Why isn't that known frankness, as the government did throughout this case, and particularly at sentencing? They labeled that as some type of a corrupt payment, but there's no evidence of corrupt payment. Didn't Zarmack testify that he thought he was making that payment in order to stay on the list? Well, the issue, Your Honor, isn't whether or not Mr. Zarmack wanted some benefit. As we know, whenever we have a political contribution of any kind, which we often get from people who get business from a city or from an individual, there's some hope that it will somehow benefit them. They're not usually doing it out of the goodness of their heart. But in this case, there's no evidence that there was any kind of corrupt purpose even conveyed to Mr. Buntzich. In fact, the $500 payment, which was in 2009, was made through a third party. Mr. Buntzich had never met Mr. Zarmack at that time, and in fact, the evidence was that he never had a face-to-face meeting with Mr. Zarmack. Mr. Zarmack indicated another $1,000 contribution was made soon after that, and I believe he does indicate in his testimony that he made it to Mr. Buntzich. But again, there's absolutely no even testimony to suggest that Mr. Buntzich accepted any kind of a donation from Mr. Zarmack for purposes of keeping him on the toll list or giving him more towing information. In fact, it's very interesting because Mr. Buntzich was upset because Mr. Buntzich added people to the list and kept those 12 people the entirety of his term as sheriff between January of 2012 and when he was removed as a result of this case. So there was no one ever removed from this list. And in fact, it should also be noted that Mr. Zarmack testified that as a result of the way that Mr. Buntzich set up the toll list, he actually, I believe he said it was one half of his large tows were actually cut back. So there's no evidence, we can label these donations or bribes, but there's no evidence that the $1,500 that Mr. Zarmack indicated he had paid had any corrupt purpose that was conveyed to Mr. Buntzich. Ms. Conant, one of the things that I was trying to, I'll just admit to being confused about, was there seems to be a little bit of a disagreement between the parties. Was Mr. Zarmack's company, CSA Towing, always on the list? Or was there a point in time, even a minor point in time, maybe between sheriffs where his company fell off? Mr. Zarmack was on the list as far as I know, going back long before. I know that he was there under the previous sheriff and I believe he was on prior to that. And how about the other fellow? Mr. Jergensen? Mr. Jergensen doesn't have quite as long a record with the Sheriff's Department, but I believe that he was under the previous sheriff, which was Roy Dominguez, and he had continued on the list going forward during the campaign and then when Mr. Buntzich was on. So from your perspective, what the record shows is that during all relevant periods of time, both companies were on the list, there was no falling off, and therefore no argument available under the facts that there was a payment to get back on. Exactly, or even to stay on. Okay, so there was evidence that one of the companies on the list was left on the list and assigned only tows out of Whiting, right? Yes, there were some changes, there were some changes. And is Whiting a major source of tows in Lake Whiting is a fairly small community, however, it has the highest school spending per pupil in the state of Indiana for a generation or three or four. So simply by its size, one cannot make a guess what goes on in Whiting. It also is where BP is located, there's a great deal of traffic coming in and out of that city, and so I don't think we can guess, but also what the government needed to do is if they were trying to connect that change, that geographic change in towing, they needed to tell us what the value of that change was. Because the assumption that there's a change in towing does not necessarily mean that there was financial benefit loss or financial benefit gain. And I do think when we look at the numbers and the percentages, it's very important because at least there's minimal change. Even from, I believe, 8% at one point to 14% at another point for it's either Jurgensen or Zarmack, it's only 5% difference. Why would it have to be change as opposed to just maintaining? Because one of their arguments was they're put on the list and they stay on the list and they maintain their because we're only talking about 2 of 12 towers that are even part of the equation. The only way to say that, quote, staying on the list is an issue is to look at the totality and that's not true because every single person stayed on the list. In fact, Your Honor, Jurgensen, who was the government informant, testified no one had paid to get on the tow list. That's cited in our papers, it's in the government papers. And the government also agrees none of the 12 towers had been removed. I do think it's important that even if we use the corrupt payments, the figures are off because though we agreed for purpose of argument that $50 per tow is a profit, if we have no corrupt towing for the first two years, obviously these figures are wrong and it should be remanded for a re-evaluation. Since the low end of the guideline is only $95,000 and we have $108,650 is the figure that was reached, clearly even deducting those tows that there's no proof, especially with Jurgensen, of any corrupt value, then we're going to have a change in the laws. I only have a brief time but I do think it's important to focus for a moment on the issue of the presumption of the guidelines which we know is faulty and 3553A has . . . Do you think a veteran judge doesn't know Booker and Gall? The question isn't whether or not the judge knew the law. The question is the manner in which the sentence was determined. The only way that we can look and determine what in fact the judge was thinking is by his words. We can't crawl into his head. Repeatedly, this judge said that the defense had not shown sufficient mitigation to get a non-guideline sentence. Okay. You've made that point in your brief. Thank you, Ms. Conner. Thank you. Mr. Haller? Good morning, Your Honors, and may it please the Court. The District Court did not clearly err in finding that in exchange for bribes, Mr. Buntzich conferred on the substantive error in its consideration of the section 3553A factors. This Court's review of that issue, assuming it doesn't find it waived, is only for clear error. Was it within the realm of possible computations that this amount was between $95,000 and $140,000? This Court already determined on the first time in front of this Court that the defendant was taking quid pro quo bribes for maintaining or expanding territory. Now, the government only began investigating and recording those bribes in April of 2014. But we didn't say, we didn't determine in the first opinion that those initial payments in 2009 were such bribes to maintain. I mean, we talked about what you had proven at trial, but that didn't, there wasn't a specific affirmation that those original payments. No doubt, Judge Saini, that's absolutely correct. But I think... Here's what my concern here is, Mr. Holler. The judge adopted, made the arguments below, both sides addressed them, and after hearing the defendant's arguments and challenge to some of the factual findings and factual disputes, namely what we've been talking about this morning, that Mr. Zarmut was already on the list, that the $500 payment was not a bribe to keep him on the list. The judge just adopted the PSR rather than engaging in those arguments and making specific factual findings. So, it's unclear if the record supports this one way or the other, because the judge didn't make those findings. So, how are we supposed to review that? Well, the district court did adopt the PSR, did overrule the objections. So, this court has traditionally said that the factual findings in the PSR are then adopted, and the question is whether those findings are clearly erroneous. But I think the question is a little bit different here, because I think the question is, do the factual findings in the PSR support the calculations in the first instance? Because the judge didn't really engage in the objections, did he? Well, I mean, the district court... The judge, there's no... I'm sorry to interrupt. I just want to make sure you understand my question. There's no factual finding as to why, or the fact that the original $500 was a bribe to maintain on the list, and that all of these toes were a benefit of that initial bribe. That's my concern. It's just, it's hard to see what to review, given that the court just adopted the PSR and didn't engage in the factual challenges that the defendant had to the PSR in the first place. So, I guess I have two sort of different responses. The first response is, the factual findings in the PSR, reviewed under clear error, are sufficient. So, the factual findings state, you know, in paragraph 133, Willie Sarmack bribed Bunsich even prior to Bunsich taking office. And there are similar findings as to Jurgensen, who's listed as CHS number one in paragraph 135. He made campaign contributions to secure favorable towing treatment as early as 2013. So, on the first point, the factual findings are in the PSR, and they were adopted by the district court, and that's what the court reviews for clear error. I guess the second broader point as to, well, is this muddy? I don't really, I think the defendant has refined his argument now on appeal, because the argument really has always been, none of this was ever bribes, none of this was ever payments, none of this was ever gratuities, this was all just the way we do business. And that was the argument on the first appeal, was the payments that we made in 2014 and 2015 and early 2016 were not bribes. This was, these were not quid pro quo bribes. But the reality, if we step back, is this is what's been going, the payments that were made in 2014, 15, and 16 are cash and campaign checks being donated to Bunsage Boosters, or in the case of the cash, supposedly being donated, although they never hit the books. There's no difference between that and the testimony as to, according to Sarmac and to Jurgensen, and frankly as to all the other tow truck operators who testified, that anything different is occurring prior to that. The only thing that's different is starting in 2014, the government is recording the conversations, and so Bunsage can't deny it. But Sarmac and Jurgensen and the other tow operators didn't testify that there was any change in behavior. And there is certainly sufficient evidence, certainly by preponderance, from which one could find that exactly the same thing is going on, that the tow truck operators have to pay to play. They have to provide these contributions. If they provide, and why do the numbers not really change? Because everybody plays the game. So everybody then stays and maintains right where they are. When people pay less, their territory gets cut and somebody else's is expanded. When they pay nothing, they get assigned a postage stamp in Whiting. And that was what the evidence was, is my opponent can call this a minor tweak, but when the minor tweak is moving the boundary from this side of Kline Avenue to the middle of the road, and the testimony is that's the steel mill street, that's the major focus, even though we're valuing them at $50 a tow, actually you can profit hundreds if not thousands of dollars on them, that minor tweak causes a major change. How do you respond to the argument that, I think it was from Mr. Sarmac, that his toes during this period either remained the same or went down? So if he's paying bribes to get more toes and he's not getting them. I don't recall him ever testifying that his toes went down. I think what the evidence shows is that the amount of toes does fluctuate. The grand pool of toes changes somewhat substantially from year to year. It goes up, it goes down. But the percentage of toes stays the same. And if one looks at the actual evidence, Sarmac's toes are one of the few that increase. Jergensen's toes essentially stay the same. The only tow truck driver whose toes increased more than Kundich, who there is evidence in the record, although he invoked his Fifth Amendment right, was paying the same cash payments that everybody else was. And other people's toes were going down. So there is evidence, I think, that yes, for the most part, these did stay the same, but this court has already held that the quid pro quo of having to pay bribes just to maintain where you are is enough. Sure, all the tow truck drivers would have loved to get all the toes. There's no doubt about that. And Mr. Bunce, it should appear, got money from whoever he would give it to and doled things up accordingly. But the mere fact that the tow truck driver wished that he could get more bang for his buck doesn't mean that he didn't get bang for his buck. Mr. Holler, can I ask you a question just to get the benefit of your impression of it? And it's this. In looking at the sentencing transcript on remand and trying to figure out is it too thin on the factual findings, that question, I noticed that the prior sentencing, before the initial appeal, that that was a 300 and some page sentencing transcript. Did that transcript, that sentencing proceeding, include more findings on the pay-to-play aspect that you were just articulating? And the reason I'm asking, just as a practical matter, what I'm trying to figure out is did some of the findings just maybe fall out even though, for efficiency purposes, even though I think everyone agrees it was plenary resentencing? What's your sense vis-a-vis the second proceeding on these factual finding questions? I don't know that there was much in the way of additional evidence that was offered and I believe the factual, the court's findings are not significantly greater than what... Just an adoption of the... It is pretty much just an adoption of PSR. There was more presentation of evidence but there was a lot of presentation on other factual issues. Mr. Buntzich had engaged in some efforts to use police resources to look up witnesses and there was an extensive defense presentation of attempted mitigation. My opponent, I know, doesn't like that word but that is what it was. So I don't know that there's too much in the prior resentencing, I think, or prior first sentencing. I think I tried to put everything that I felt was valuable in the record. But I, you know, I agree the district court did simply adopt the PSR. The district court did not make extensive findings. But I think on a clear error standard of review, I think there is enough here to say these findings are not clearly erroneous. Keep in mind the admitted payments of $38,000 in bribes from 2014 on and the payments made before that are, you know, also related here. It's very difficult for me to believe that SoTruck drivers would have paid tens of thousands of dollars in cash and hard time given the just pure adoption of the PSR and the reasoning in the PSR without more when it was the reasoning of the PSR that the defendant was challenging in the first instance. And you may be able to establish all of this and the court may have been thinking of all that. It's just hard to tell from a pure adoption of the PSR without more here. I understand that, Your Honor. Again, you know, I have no doubt the district court could do more. I have very little doubt that if this court remanded, the district court would do more. But that said, on the standard of review, I think there is enough in the PSR and adopting the PSR for the court to reach that standard. I am out of time. I am happy to address the other procedural sentencing issues that the court wants, but otherwise we would rest on the brief and ask that the court affirm. Thank you, Mr. Holler. One minute rebuttal, Ms. Conner. To answer the court's question, though the transcript was longer at the first sentencing, the government focused on other information and, in fact, the court did rule that it wasn't going to consider a lot of it. But in terms of what the court said, in terms of factual findings, it was even more brief in the first sentencing than it was in the second. On page four of our brief, our opening brief in this case, I noted that, again, the court stated, quote, there's no factual foundation of material substance which would warrant a sentence below the applicable advisory guideline sentencing range. That was virtually all that the judge said. And once again, the judge simply adopted the sentence report. I would note, again, that as was discussed a moment ago in the PSR, when there is a mention of the $500, it is merely a conclusion. There is no factual information offered in the PSR to justify that, in fact, that $500 was a bribe. In fact, I believe... Thank you, Ms. Conner. Okay, thank you. Case is taken under advisement.